UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL BURKS, SR. and LADONNA
BURKS,

       Plaintiffs,                      Case No. 07-13693

v.

                                       Honorable Patrick J. Duggan

WASHINGTON MUTUAL BANK, F.A.;
FIDELITY NATIONAL FIELD
SERVICES; and TROTT AND TROTT,
P.C.,

       Defendants.
_____/

## OPINION AND ORDER

At a session of said Court, held in the U.S.
District Courthouse, City of Detroit, County of
Wayne, State of Michigan, on November 17, 2008.

PRESENT:      THE HONORABLE PATRICK J. DUGGAN
                        U.S. DISTRICT COURT JUDGE

In July 2007, Plaintiffs Michael and LaDonna Burks (collectively "plaintiffs,"

individually "Mr. Burks" or "Mrs. Burks") filed this lawsuit in Wayne County Circuit

Court against Defendants Washington Mutual Bank, F.A. ("WaMu"); Fidelity National

Field Services ("Fidelity"); and Trott and Trott, P.C. ("Trott").  Plaintiffs alleged four

claims: conversion; violation of Michigan's Anti-Lockout statute (Mich. Comp. Laws §

600.2918); exemplary damages; and, as to Trott only, violation of the Fair Debt

Collection Practices Act ("FDCPA") (15 U.S.C. § 1692).  The case was removed to this Court in August 2007 and presently before the Court are four motions for summary judgment.  The motions have been fully briefed and this Court held a hearing on November 12, 2008.  For the reasons set forth below, the Court denies plaintiffs' motion for summary judgment and grants summary judgment to all defendants on all counts.

## I. Facts and Procedural Background

The events that gave rise to the present litigation involve what was formerly plaintiffs' home in Wyandotte, Michigan, where they lived with their four children.  In 2006, plaintiffs defaulted on the home mortgage owing to WaMu.  In response, WaMu hired Trott to initiate foreclosure proceedings.  Trott pursued this action during the summer of 2006 and WaMu ultimately purchased the home with a full-debt bid at a sheriff's sale on August 9, 2006.  Plaintiffs, however, remained in possession of the home and had six months to redeem the property pursuant to Michigan statute.  Mich. Comp. Laws § 600.3240(8).

Around this time, Mrs. Burks father, who lives in Georgia, had become ill and needed assistance.  By late August, Mrs. Burks left Michigan with her two youngest children to attend to him.[1]  Although she did not ultimately return, Mrs. Burks maintains

---

[1]While there is some record evidence that Mrs. Burks left Michigan in early July, Mrs. Burks claims that she left August 28.  The Court need not determine the precise date of Mrs. Burks departure for purposes of this litigation.  It is sufficient to note that there is no dispute that Mrs. Burks was absent from the home during the months of September and October 2006.

that she did not intend to permanently leave Michigan at that time and only took a few suitcases of belongings for her and the younger children. Mr. Burks and the two older children remained in Michigan. On August 25, 2006, however, water and electricity services were turned off at the home. Mr. Burks began residing with his brother who lived nearby but it remains unclear where the two older children went. In any case, it is doubtful that anyone lived at the home after services were turned off, and Mr. Burks went to visit his wife in Georgia on September 8, 2006.

Meanwhile, to protect its investment during the redemption period, WaMu hired Fidelity to conduct weekly exterior inspections of the home. Fidelity, in turn, hired a subcontractor to perform the actual inspections. After an inspection report on September 9, 2006, indicated that the home was vacant, WaMu requested that Trott initiate procedures to shorten the redemption period pursuant to Mich. Comp. Laws § 600.3241a. Trott then requested that Detroit Legal News arrange for someone to "inspect" the property for abandonment. The Detroit Legal News hired Metropolitan Processing Services who sent its employee, Kenneth Bosley, to do the inspection. After standing outside the front of the home for 20 to 30 seconds, Mr. Bosley concluded the home was abandoned and posted a notice of abandonment on the front door. On September 15, 2006, Mr. Bosley signed an affidavit stating that the home was abandoned and the affidavit eventually made its way back to Trott. To satisfy statutory requirements, Trott sent the notice of abandonment by certified mail to Mr. Burks's last known address

which, at that time, was the home in Wyandotte.  Ultimately, the postal service forwarded

the notice to Georgia where Mr. Burks signed for it on October 13, 2006.

Believing the home to be abandoned, WaMu and Fidelity hired K&J Property

Maintenance, Inc. ("K&J") to perform "property preservation services."  On September

19, 2006, K&J employees entered the home through the side door to assess its condition,

perform necessary cleaning, and dispose of hazardous materials.  Upon entry, the

employees found the majority of plaintiffs' personal property; some rooms were full of

packed boxes while others remained disheveled as if recently lived in.  There was also

rotting food in a freezer.   K&J took extensive photographs documenting the home's

condition.  When the employees left, they changed the lock on the side door so that it

would be secure until they returned for additional maintenance.

Mr. Burks returned to the property the next day and found himself locked out.

Although K&J changed only the side door lock, plaintiffs did not use and could not get in

through the front door.  While at the property, Mr. Burks observed the notice of

abandonment and called his wife.  Plaintiffs assert that they mailed a letter notifying Trott

that they had not abandoned the home that same day.  Trott never received the letter and

all of the defendants argue that plaintiffs fabricated this letter for purposes of litigation.

In any case, Mr. Burks returned to Georgia on September 24, 2006, after finding himself

unable to enter the home.

On October 13, 2006–the day Mr. Burks signed for the forwarded notice of

abandonment–Mr. Burks called Trott to discuss the property.  Although the notice

4

advised Mr. Burks that he would have 15 days from receipt of the letter to inform Trott that he had not abandoned the home, a Trott employee told him that the redemption period had expired that day. Mr. Burks responded that he had no interest in the home but wanted to retrieve his belongings; he made no mention of the alleged September 20 letter. The Trott employee informed Mr. Burks that he would have to coordinate the retrieval of his belongings with the eviction process. Mr. Burks then provided his new mailing address in Georgia for future communications. Mr. Burks contacted Trott by phone again on October 20 and 25, 2006, to demand access to his belongings.

Trott filed a summons and complaint on behalf of WaMu on October 25, 2006, to obtain possession of the home by way of a summary proceeding in a Michigan district court. Attached to the complaint was the affidavit of Mirela Albu, a Trott employee, stating that WaMu had "caused to be made a personal inspection of the mortgaged premises" on September 15, 2006, and that the premises appeared to be vacant at that time; the affidavit was referring to the "inspection" performed by Mr. Bosley. Although Trott did not provide Mr. Burks's Georgia address to the Michigan court, Trott's files indicate that it mailed the summons and complaint to the Georgia address that day.

On October 26, 2006, Fidelity hired Property Maintenance, Inc. ("PMI") to perform additional maintenance services and to change the lock on the front door of the property. Then, when Mr. Burks returned on October 28 or 30, a PMI employee let him in to retrieve his personal property. As Mr. Burks packed, however, he realized that some items were missing. Plaintiffs ultimately reported that nearly $30,000 worth of property

5

had been stolen. Missing items included jewelry, clothing, electronics, and children's toys. Plaintiffs also alleged that some of their towels had been used as toilet paper. Nonetheless, Mr. Burks, with the help of a few family members, packed what remained and, when Mr. Burks left the home that day, he had removed all the property he and his wife intended to keep.

On November 13, 2006, the Michigan district court entered a default judgment awarding WaMu possession of the home based on plaintiffs' abandonment. Plaintiffs claim that they did not receive the summons and complaint until November 16. Recently, plaintiffs moved to set aside the default judgment on grounds that they had not received proper notice. The Michigan district court denied that motion September 28, 2008.

The present lawsuit alleging conversion, anti-lockout violations, and FDCPA violations was removed to this Court in August 2007. In October 2007, Fidelity filed third party complaints against K&J and PMI but these parties were dismissed from the action by stipulated order on September 17, 2008. On September 24, 2008, the parties also stipulated to the dismissal of Trott from counts I and II (the conversion and anti-lockout claims). Presently before the court are four motions for summary judgment with responses and replies to each: two motions from WaMu and Fidelity, filing together; and one each from plaintiffs and Trott.

**II. Standard for Summary Judgment**

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323, 106 S. Ct. at 2553. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *Id.* at 255, 106 S. Ct. at 2513. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *Id.* at 255, 106 S. Ct. at 2514.

### III. *Rooker-Feldman* and Res Judicata

Each defendant has moved for summary judgment on grounds that plaintiffs' claims are barred by the *Rooker-Feldman* and res judicata doctrines. These arguments refer to the Michigan district court summary proceeding that awarded possession of the home to WaMu. In response, plaintiffs deny that their injuries arise from the state court judgment and assert that they were not required to attach their present claims to a summary proceeding.

### A. *Rooker-Feldman*

The *Rooker-Feldman* doctrine generally prohibits federal district courts from performing appellate review of state court rulings. *Lawrence v. Welch*, 531 F.3d 364, 368 (6th Cir. 2008). In 2005, however, the Supreme Court narrowly defined the types of claims that invoke "appellate" review. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284, 125 S. Ct. 1517, 1521-22 (2005) ("The *Rooker-Feldman* doctrine, we hold today, is confined to cases . . . brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."). Pursuant to this narrow interpretation of the doctrine:

> The inquiry . . . is the source of the injury the plaintiff alleges in the federal complaint. If the source of the injury is the state court decision, then the *Rooker-Feldman* doctrine would prevent the district court from asserting jurisdiction. If there is some other source of injury, such as a third party's actions, then the plaintiff asserts an independent claim.

*McCormick v. Braverman*, 451 F.3d 382, 393 (6th Cir. 2006). Furthermore, claims concerning third party actions remain independent "even if relief is predicated on denying the legal conclusion reached by the state court." *Brown v. First Nationwide Mtg. Corp.*, 206 Fed. Appx. 436, 439 (6th Cir. 2006); *see also Exxon*, 544 U.S. at 293, 125 S. Ct. at 1527.

Although some of plaintiffs' claims challenge factual conclusions underlying the state court decision, none of the claims directly challenge the decision or allege injury as a result of the decision. To the contrary, plaintiffs claim injury from the alleged conduct of the various defendants in the months leading up to the state court decision. More specifically, plaintiffs assert that they have been injured by defendants' entry into the home, taking of personal property, changing of the locks, and deceptive debt collection practices. Furthermore, the relief requested by plaintiffs will not vitiate or overturn the state court decision because plaintiffs do not seek possession of the home. For these reasons, none of plaintiffs' claims are barred by *Rooker-Feldman*.

**B. Res Judicata**

While plaintiffs' challenges to the underlying conclusions of the state court do not trigger *Rooker-Feldman*, they are subject to the affirmative defense of res judicata. *See Exxon*, 544 U.S. at 293, 125 S. Ct. at 1527 ("If a federal plaintiff present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party . . . , then there is jurisdiction and state law determines

whether the defendant prevails under principles of preclusion." (internal quotation omitted)). In Michigan, res judicata, or collateral estoppel, applies when:

> (1) there has been a prior decision on the merits, (2) the issue was either actually resolved in the first case or could have been resolved in the first case if the parties, exercising reasonable diligence, had brought it forward, and (3) both actions were between the same parties or their privies.

*Paige v. City of Sterling Heights*, 476 Mich 495, 522 n.46, 720 N.W.2d 219, 234 n.46 (2006). However, where a party seeks to assert the doctrine defensively, only the first two requirements need be met. *Monat v. State Farm Ins. Co.*, 469 Mich. 679, 695, 677 N.W.2d 843, 852 (2004). Therefore, Fidelity and Trott can raise the res judicata defense even though only WaMu and plaintiffs were parties to the state court decision.[2]

In the present case, defendants assert that the state court award of the home to WaMu precludes plaintiffs' claims. Plaintiffs counter that the issues presented by their claims were not actually litigated below and that statutory modifications to res judicata in the context of summary proceedings protect their claims. Michigan statutory law modifies the second requirement of res judicata in summary proceedings like the one at issue in this case so that "attorneys [will] not be obliged to fasten all other pending claims to the swiftly moving summary proceedings." *J.A.M. Corp. v. AARO Disposal, Inc.*, 461 Mich 161, 169, 600 N.W.2d 617, 621 (1999) (interpreting Mich. Comp. Laws § 600.5750). Therefore, only issues actually litigated in summary proceedings are

---

[2]Because Fidelity and Trott raise res judicata defensively, this Court need not determine if they qualify as privies to WaMu in the state court proceedings.

precluded in subsequent litigation. *Sewell v. Clean Cut Mgmt., Inc.*, 463 Mich. 569, 576-77, 621 N.W.2d 222, 225 (2001). The question, then, is what issues were actually litigated when the state court awarded possession of the home to WaMu.

Michigan law generally provides that a mortgagor in plaintiffs' position has six months to redeem a home sold at foreclosure. Mich. Comp. Laws § 600.3240(8). That redemption period can be reduced to as little as thirty days, however, if the mortgagor abandons the home. *Id.* § 600.3240(11). To obtain the shortened redemption period, the mortgagee must provide notice to the mortgagor that the premises are considered abandoned. *Id.* § 600.3241a. In this case, a notice of abandonment was posted on the home on September 15, 2006, and mailed to Plaintiffs on September 27. Based on this information, the state court shortened the redemption period and awarded WaMu possession of the home on November 13, 2006. In so doing, the state court necessarily determined that plaintiffs had, in fact, abandoned the property and the abandonment is presumed to have begun September 15, 2006.

Plaintiffs now contend in this Court, however, that they successfully refuted the presumption of abandonment by mailing a letter to that effect to Trott on September 20, and by calling on October 13, 2006.[3] *See id.* §300.3241a(c). This Court, however,

---

[3]As previously noted, defendants maintain that they never received the September 20 letter and argue that plaintiffs have fabricated its existence to further their present claims. And while plaintiffs make much of the October 13 phone call, Trott's records indicate that Mr. Burks only stated that he did "not want *property* wants his *stuff*." (Trott's Mot. for Summ. J., Ex. F (emphasis added).)

cannot ignore the state court ruling on the issue. The default judgment is considered a decision on the merits, *see City of Detroit v. Nortown Theater, Inc.*, 116 Mich. App. 386, 392, 323 N.W.2d 411, 413-14 (1982), and the state court has since denied plaintiffs' motion to set the judgment aside. Therefore, plaintiffs are barred from relitigating the issue in this Court.

The state court conclusion regarding abandonment precludes the second count of plaintiffs' complaint.[4] Michigan's Anti-Lockout statute includes an affirmative defense in the case of abandonment. *Id.* § 600.2918(3)(c). Because the home had been abandoned, WaMu and Fidelity did not unlawfully interfere with any possessory interests when they changed the locks. In an attempt to avoid this conclusion, plaintiffs note that, while possession was awarded to WaMu on November 13, 2006, the locks were changed as early as September 19. As noted above, however, Michigan law requires that a mortgagee establish abandonment for at least thirty days before a court awards possession and, in this case, the presumption of abandonment began September 15, 2006. *See id.* §§ 600.3240(11), 3241a. For these reasons, WaMu and Fidelity are entitled to summary judgment on plaintiffs' anti-lockout claim (count II).

## IV. Count I: Conversion of Personal Property

---

[4]The parties dispute whether Michigan's Anti-Lockout statute even applies to the circumstances of this case. Absent use of physical force–which is not alleged here–only "tenants" can assert claims under the statute. Mich Comp. Laws § 600.2918. The parties disagree about whether a mortgagor in possession during a redemption period after sheriff's sale qualifies as a "tenant." Because plaintiffs cannot succeed on this claim regardless of their status, the Court does not address this issue.

Count I of plaintiffs' complaint asserts a conversion claim against WaMu and Fidelity. Plaintiffs rest their claim on two grounds: (1) WaMu and Fidelity unlawfully denied plaintiffs access to their personal property by locking them out of the home, and (2) WaMu and Fidelity removed or stole certain items from the home. "[C]onversion is defined as any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Foremost Ins. Co. v. Allstate Ins. Co.*, 439 Mich. 378, 391, 486 N.W.2d 600, 606 (1992). WaMu and Fidelity deny that their conduct qualifies as conversion, disclaim responsibility for the conduct of independent contractors, and dispute that any property was actually converted.

## A. Changing the Locks

In regard to plaintiffs' allegations that they were denied access to their personal property, WaMu and Fidelity respond that plaintiffs consented to their entry and securing of the home. Section five of the mortgage agreement states, "Lender may inspect the Property if the Property is vacant or abandoned or the loan is in default. Lender may take reasonable action to protect and preserve such vacant or abandoned Property." (WaMu & Fidelity Second Mot. for Summ. J., Ex. 1.) As discussed in Section III.B, *supra*, the state court summary proceeding established that the home was, in fact, abandoned at the time WaMu and Fidelity caused the lock to the side door to be changed on September 19, 2006, and plaintiffs' arguments to the contrary are barred. Therefore, WaMu and Fidelity contend that they were entitled to change the lock on the home as a reasonable action to protect and preserve the property.

13

Plaintiffs argue, however, that the quoted contract language is unconscionable and in contravention of public policy and law. Specifically, plaintiffs complain that "Defendants' logic would allow it [sic] to simply trot on to debtors' property whenever any of its mortgagors are in default of their home loans." (Pl.'s Resp. to Second Mot. for Summ. J. at 8.) Plaintiffs misconstrue the contract language and defendants' position. Defendants do not claim a right to enter properties upon default; rather, defendants assert that the contract allows them to enter properties upon vacancy or *abandonment* to protect their interests therein. The Court cannot say that such a provision in the contract is "unconscionable."[5]

Finally, plaintiffs argue that it was unreasonable for defendants to change the side door lock on the home because plaintiffs did not use and did not have keys to enter through the front door.[6] Defendants maintain that they changed the lock on the home's

---

[5]"In order for a contract or contract provision to be considered unconscionable, both procedural and substantive unconscionability must be present." *Clark v. DiamlerChrysler Corp.*, 268 Mich. App. 138, 143, 706 N.W.2d 471, 474 (2005). A contract provision is only substantively unconscionable where its substantive unreasonableness is "so extreme as to shock the conscience." *Id.* at 144, 706 N.W.2d at 475. The provision at issue in this case does not shock the conscience of the Court and, furthermore, plaintiffs fail to argue procedural unconscionability.

[6]Plaintiffs do not argue in their briefs that defendants were aware of these unusual circumstances but plaintiffs' counsel argued at the November 12, 2008, hearing that inspection of the home would have revealed that the front door was locked from the inside with a slide-lock that could not be operated from outside. There is no evidence, however, that those who inspected the home made this observation or that they intended to deny plaintiffs access to the contents of the home when they changed the side door lock.

secondary entrance after inspecting it for hazardous materials to ensure its security while also allowing a means for reentry at a later date. Defendants did not act unreasonably in protecting their interest in the abandoned property.[7] Therefore, WaMu and Fidelity are entitled to summary judgment to the extent plaintiffs' conversion claim depends on defendants' changing of the locks.

**B. Removal or Theft of Plaintiffs' Personal Property**

Plaintiffs' primary complaint against WaMu and Fidelity involves the alleged disappearance of an estimated $30,000 worth of personal property from the home between September 8 and October 28 or 30, 2006. Although the parties have raised and addressed numerous issues in regard to this claim, the threshold issue is whether WaMu and Fidelity can be held liable for the conduct of the independent contractors they hired to secure the home.[8] Defendants cite several cases to support the contention that a general

_____

[7]Plaintiffs also complain that defendants changed the lock on the front door on October 26, 2006, thereby ensuring that plaintiffs would not have access to their belongings. However, plaintiffs gained entry to the home on October 28 or 30, 2006. Plaintiffs have not alleged damages related to this two or four day lapse and, therefore, cannot succeed on this portion of their conversion claim.

[8]Other issues addressed by the parties include whether the identified personal property has been converted or merely misplaced by plaintiffs and who, if anyone, could be responsible for taking plaintiffs' property. For purposes of this motion, the Court assumes that the personal property identified by plaintiffs has, in fact, been converted and that those who entered the home on behalf of WaMu and Fidelity were in the best position to take plaintiffs' property.

In their briefs, plaintiffs do not dispute defendants' characterization of K&J and PMI as independent contractors but, rather, assert that the distinction is irrelevant. During the November 12, 2008, motion hearing, however, plaintiffs' counsel argued that the nature of the relationship between defendants and K&J and PMI is a question of fact.

contractor is not liable for the negligence of its independent contractor. Plaintiffs respond that those cases are confined to negligence actions and argue that principals are *always* liable for their agents' intentional torts regardless of whether those agents are employees or independent contractors. Plaintiffs' argument lacks merit.

Michigan follows the general rule that "a principal is responsible for the acts of its agents done within the scope of the agent's authority." *Dick Loehr's, Inc. v. Secretary of State*, 180 Mich. App. 165, 168, 446 N.W.2d 624, 626 (1989). Whether an act is "done within the scope of the agent's authority," however, depends largely on the nature of the action–intentional or negligent–and the nature of the relationship between the tortfeasor and the defendant–employee or independent contractor. In regard to the nature of the act, "[i]ntentional and reckless torts are generally held to be beyond the scope of employment." *Borsuk v. Wheeler*, 133 Mich. App. 403, 410, 349 N.W.2d 522, 526 (1984). And as to the nature of the relationship, a defendant is less likely to be held liable for the acts of an independent contractor than an employee. *See Hartford Fire Ins. Co. v. Walter Kidde & Co., Inc.*, 120 Mich. App. 283, 294, 328 N.W.2d 29, 34 (1982) ("Generally, one who employs an independent contractor is not vicariously liable for the latter's negligence."). In fact, some courts suggest that an independent contractor is not even an "agent" of the person that hires him. *See, e.g.*, *Powers v. Peoples Cmty. Hosp.*

---

When pressed regarding this argument, plaintiffs' counsel could cite nothing in the law or the facts of this case to support his argument. Therefore, the Court also assumes that K&J and PMI are, in fact, independent contractors.

*Auth.*, 183 Mich. App. 550, 556, 455 N.W.2d 371, 374 ("Physicians with staff privileges

at a hospital are generally considered independent contractors, and are not considered

agents of that hospital for purposes of vicarious liability.").  Contrary to plaintiffs'

argument, then, it is relevant that WaMu and Fidelity hired independent contractors to

secure the home.[9]

Although neither party cites cases involving both intentional torts *and* independent

contractors, those cited by defendants explain the proper disposition of this claim.

Michigan courts have explained that they generally refuse to hold principals liable for the

*negligence* of their independent contractors because "an independent contractor is not

subject to the control of the employer . . . ."  *Hartford Fire*, 120 Mich. App. at 294, 328

N.W.2d at 34.  This rationale applies with equal force to *intentional torts* committed by

independent contractors and plaintiffs have cited no authority to the contrary.  *See*

*Lulanaj v. Multi-Building Co., Inc.*, No. 230422, 2002 WL 988578, at *3, *5 (Mich. Ct.

App. May 10, 2002) ("[F]oisting liability upon a general contractor for the intentional

torts committed by a subcontractor's contractor would not further the purpose served by

the law of torts.").  Therefore, WaMu and Fidelity cannot be held liable for the intentional

torts of their independent contractors and they are entitled to summary judgment on

---

[9]In support of their argument, plaintiffs emphasize cases that have found principals liable for the intentional torts of their *agents*.  (Pl.'s Resp. to Second Mot. for Summ. J. at 9-10.)  None of these cases, however, specifically contemplate independent contractors. Because it is unclear whether independent contractors are actually agents, this case law is not particularly persuasive.

plaintiffs' conversion claim (count I). Furthermore, plaintiffs' claim for exemplary damages (count III) depends on the conversion and anti-lockout claims. Because plaintiffs cannot succeed on those claims, defendants are also entitled to summary judgment on count III.[10]

## V. Count IV: FDCPA

Plaintiffs' final claim alleges that Trott violated the FDCPA by falsely informing Mr. Burks that his redemption period had expired on October 13, 2006, and by using fraud to obtain judgment in the state court summary proceedings. In its various motions and responses, Trott has argued that these claims are barred by *Rooker-Feldman* and res judicata, that Trott is not a "debt collector," that lien enforcement is not "debt collection," that the sheriff's sale of the home extinguished plaintiffs' debt, that Trott cannot be held liable for the false statements of its independent contractor, and that any misstatements by Trott's employees are sheltered by the good faith defense to the FDCPA. Trott has admitted, however, that it identified itself as a "debt collector" in letters to Mr. Burks during the foreclosure proceedings and that "the redemption shortening could possibly be defective" because the inspection by Mr. Bosley on September 15, 2006, failed to meet the requirements of Mich. Comp. Laws § 600.3241a. Plaintiffs maintain that these

---

[10]Although plaintiffs do not explicitly limit their exemplary damages claim to counts I and II, exemplary damages are not available for violations of the FDCPA. 15 U.S.C. § 1692k(a).

admissions are sufficient to impose liability under the FDCPA. Plaintiffs have failed, however, to establish a threshold requirement of their claim.

Plaintiffs' FDCPA claim specifically arises under chapter 15 sections 1692e and 1692f of the United States Code. These sections can only be violated by debt collectors who are collecting, or attempting to collect, "debts." The FDCPA defines "debt" as "any *obligation* or alleged *obligation* of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such *obligation* has been reduced to judgment." 15 U.S.C. § 1692a(5) (emphasis added).

At the time of Trott's allegedly abusive conduct plaintiffs had no outstanding obligation to pay money because the foreclosure proceedings were complete and the home had already been sold at a sheriff's sale.[11] Regardless of Trott's status as a debt collector or whether lien enforcement qualifies as "debt collection," there was neither a "debt" nor a "lien" for Trott to enforce at the time of the alleged violations in this case.[12]

---

[11]Although it is possible in Michigan for a mortgagor to remain liable for a deficiency after a sheriff's sale, there was no deficiency in this case; WaMu purchased the property with a full-debt bid.

[12]Most recent cases involving foreclosures and the FDCPA allege violations during the actual foreclosure proceedings or sheriff's sale. *See e.g.*, *Givens v. Homecomings Financial*, 278 Fed. Appx. 607 (6th Cir. 2008). The parties have not identified, nor has the Court discovered, any cases dealing with alleged FDCPA violations during the redemption shortening and eviction process.

Therefore, plaintiffs' FDCPA claim (count IV) must fail and Trott is entitled to summary judgment.

## VI. Conclusion

For the reasons set forth above, defendants are entitled to summary judgment on all counts. The doctrine of res judicata bars plaintiffs' attempts to relitigate the issue of abandonment in this Court. As a consequence, plaintiffs' anti-lockout claim–to which abandonment is a defense–is barred. Plaintiffs' conversion claim also fails because plaintiffs abandoned the home and because WaMu and Fidelity cannot be held liable for the intentional torts of their independent contractors. Based on the failure of the conversion and anti-lockout claims, plaintiffs cannot recover exemplary damages. Finally, Trott is entitled to summary judgment on plaintiffs' FDCPA claims because its allegedly wrongful conduct did not occur during the collection, or attempted collection, of a debt.

Accordingly,

**IT IS ORDERED** that WaMu and Fidelity's Motion for Summary Judgment Due to Bar by the *Rooker-Feldman* and Res Judicata Doctrines is **GRANTED** as to count II (anti-lockout claim).

**IT IS FURTHER ORDERED** that WaMu and Fidelity's Second Motion for Summary Judgment is **GRANTED** as to count I (conversion) and count III (exemplary damages).

**IT IS FURTHER ORDERED** that Trott's Motion for Summary Judgment

Pursuant to FRCP 56(c) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment

Pursuant to FRCP 56a is **DENIED**.

A judgment consistent with this opinion shall issue.


s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Gary D. Nitzkin, Esq.
David G. Marowske, Esq.
Charles H. Hahn, Esq.